UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ASK Chemicals LP,          )
                                      )
        Plaintiff,      )
                                      )     Civil Action No.:  2:12-cv-68
           v.           )     District Judge James Graham
                                      )     Magistrate Judge Elizabeth Preston Deavers
Computer Packages Inc.,    )
                                      )
        Defendant.    )

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
## TO EXCLUDE THE EXPERT REPORT OF BRIAN A. RUSSELL

# R E D A C T E D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ASK Chemicals LP,                )
                                 )
         Plaintiff,              )
                                 )        Civil Action No.:  2:12-cv-68
         vi.                     )        District Judge James Graham
                                 )        Magistrate Judge Elizabeth Preston Deavers
Computer Packages Inc.,          )
                                 )
         Defendant.              )

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
## TO EXCLUDE THE EXPERT REPORT OF BRIAN A. RUSSELL

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................... i

TABLE OF CASES ................................................................. iii

TABLE OF AUTHORITIES ........................................................... v

I. INTRODUCTION ................................................................ 1

II. THE RELEVANT LAW .......................................................... 3

III. MR. RUSSELL'S REPORT DOES NOT CONFORM TO THE REQUIREMENTS
     OF FEDERAL RULE OF CIVIL PROCEDURE – RULE 26 ........................... 7

IV. MR. RUSSELL IS NOT QUALIFIED TO OFFER OPINION TESTIMONY ON THE
    VALUE OF A FOREIGN PATENT OR ANY LOST PROFITS ASSOCIATED WITH
    SAID PATENT ............................................................. 16

V. MR. RUSSELL'S REPORT LACKS SUFFICIENT FACTS OR DATA AND HIS
   OPINIONS ARE SPECULATIVE AND UNRELIABLE ................................. 18

   A. The Bulk Of Mr. Russell's Report Is Comprised Of Opinions Of ASK
      Employees or ASK's Counsel, Not Mr. Russell, And Were Accepted Without
      Independent Verification ............................................ 19

   B. Mr. Russell's Methodology And Assumptions Are Inconsistent With Case Facts ........ 26

    C.  Mr. Russell's Damage Calculation Fails To Account For Plaintiff's Ability
        to Mitigate ..................................................................................................... 35

    D.  Mr. Russell's Methodology is Speculative .................................................... 36

VI.  MR. RUSSELL'S METHODOLOGY CALCULATES ECONOMIC DAMAGES
      BEYOND THE SUBJECT PATENT'S EXPIRATION ....................................... 40

VII.  MR. RUSSELL'S METHODOLOGY UTILIZES PATENT LICENSES THAT
       ARE NOT COMPARABLE TO THE HYPOTHETICAL LICENSE MR. RUSSELL
       IS ATTEMPTING TO CREATE .................................................................. 41

VIII.  MR. RUSSELL'S RELIANCE UPON HIS GENERAL EXPERIENCE IS NOT
        ENOUGH ................................................................................................ 44

IX.  CONCLUSION ......................................................................................... 46

## <u>TABLE OF CASES</u>

<u>Page</u>

*Ammons v. Aramark Uniform Serv. Inc.,* 368 F.3d 809, 816 (7th Cir. 2004) ................................ 5

*Aponte v. City of Chicago,* 2011 U.S. Dist. LEXIS 52130 *6-8 (N.D. Ill May 12, 2011) .......... 19

*Ciomber v. Coop. Plus, Inc.,* 527 F.3d 635, 642-43 (7th Cir. 2007) ................................ 7, 16, 45

*Clark v. Takata Corp.,* 192 F.3d 750, 759 n.5 (7th Cir. 1999) ..................................................... 5

*Cunningham v. Masterwear, Inc.,* 2007 WL 1164832, at *2 (S.D. Ind. Apr. 19, 2007) ............... 6

*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993) ............2, 3, 4, 5, 6, 16, 18, 19, 25, 26

*General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S. Ct. 512, 139 L.Ed.2d
508 (1997) ......................................................................................................3, 16, 26, 45

*Gentieu v. Tony Stone Images/Chicago, Inc.,* 214 F.Supp.2d 849, 851 (N.D. Ill. 2002) ........ 6, 25

*Goebel v. Denver Rio Grande W.R.R. Co.,* 215 F.3d 1083, 1084 (10th Cir. 2000) ...................... 3

*Happel v. WalMart Stores, Inc.,* 602 F.3d 820, 825 (7th Cir. 2010) ........................................... 6

*Havard v. Baxter Int'l Inc.,* 2000 Dist. LEXIS 21316, 7 (N.D. Ohio 2000) ............................... 26

*Hot Wax, Inc. v. Warsaw Chemical Co.,* 45 F.Supp.2d 635, 639 (N.D. Ill. 1999) ..................... 19

*Jenkins v. Bartlett,* 487 F.3d 482, 489 (7th Cir. 2007) ............................................................. 6

*Johnson, et al. v. Manitowoc Boom Trucks, Inc.,* 484 F.3d 426, 429 (6th Cir. 2007) ................... 4

*King-Indiana Forge, Inc. v. Millennium Forge, Inc.,* 2009 U.S. Dist. LEXIS 96131, *4
(S.D. Ind. September 29, 2009) .......................................................................... 19, 25

*Kovacic, et al. v. Tyco Valves & Controls, L.P. et al.,* 433 Fed. Appx. 376, 379
(6th Cir. 2011) ................................................................................................................ 7

*Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999) ............................... 2, 4, 6, 25, 26

*Lang v. Kohl's Food Stores, Inc.,* 217 F.3d 919, 924 (7th Cir. 2000) .................................... 19, 20

*LG Elecs v. Whirlpool Corp.,* 2010 U.S. Dist. LEXIS 91739, *16 (N.D. Ill. September 3,
2010) ............................................................................................................................. 20

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D. Ill. 2005) ......... 19

*Lucent Techs., Inc. v. Gateway*, 580 F.3d 1301, 1327–28 (Fed Cir. 2009) ................................. 44

*MDG International, Inc. v. Australian Gold, Inc.*, 2009 U.S. Dist. LEXIS 55652, *18
(S.D. Ind. June 29, 2009) ................................................................................................. 25

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ............................... 5

*Minix v. Canarecci,* 597 F.3d 824, 835 (7th Cir. 2010) ............................................................... 6

*Nelson, et al. v. Tennessee Gas Pipeline Co., et al.,* 243 F.3d 244, 254 (6th Cir.
2001) ................................................................................................................... 3, 4, 45

*Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1311 (Fed. Cir. 2004) ........................ 29

*Pride v. Bic Corporation,* 218 F.3d 566, 577 ............................................................5, 7, 16, 45

*ResQNet.Com, Inc., et al. v. Lansa,* Inc., 594 F.3d 860 (Fed. Cir. 2010) .................................... 44

*Rite-Hite Corp. v. Kelley Co.,* 56 F.3d 1538 (Fed. Cir. 1995) ....................................................29

*Tamraz, et al., v. Lincoln Electric Co., et al.,* 620 F.3d 665, 671 (3d Cir. 2010) ........ 3, 4, 5, 6, 45

*Tober v. Graco Children's Products, Inc.*, 2004 U.S. Dist LEXIS 9010 at *3 (S.D.
Ind. Mar. 4, 2004) ........................................................................................................... 6

*TP Orthodontics, Inc. v. Prof'l Positioner's, Inc.*, 1990 U.S. Dist. LEXIS 15219, *30 ............. 41

*United States v. Mamah,* 332 U.S. 475, 478 (7th Cir. 2003) ....................................................... 6

*Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286 (Fed. Cir. 2007) ......................................... 29

*Zenith Elec. Corp. v. WH-TV Broad. Corp.,* 395 F.3d 416, 419 (7th Cir. 2005) ........................... 6

## <u>TABLE OF AUTHORITIES</u>

Fed. R. Civ. P. 26(a)(2)(B) ................................................................................. 7, 16

Fed. R. Evid. 702 ................................................................ 2, 3, 4, 5, 16, 18, 19, 26, 45

Defendant Computer Packages Inc. ("CPI") respectfully submits this Memorandum in Support of its Motion to Exclude the Report of Brian A. Russell, an expert proposed by Plaintiff ASK Chemicals LP ("ASK").

## I.  INTRODUCTION

The present litigation relates to possible damages suffered by ASK due to the lapsing of Japanese Patent No. 3278168 ("'168 Patent").  The '168 Patent relates to riser sleeves which convey molten metal into a mold and assists in preventing damage to the molded product due to contraction of the metal as it solidifies.  Ashland Inc. ("Ashland"), and subsequently ASK, obtained the '168 Patent, and through a foreign joint venture entity (not in the present litigation) has attempted to market a riser sleeve in Japan which is allegedly covered by the '168 Patent. The riser sleeves that allegedly incorporate the same technology as the '168 Patent are sold in other countries.  Ashland subsequently assigned the '168 Patent to Ashland Licensing and Intellectual Property LLC, an entity to which patents were assigned due to a reorganization of Ashland in 2010.  Ashland Licensing and Intellectual Property LLC assigned all of its patents in the foundry field to ASK, including the '168 Patent.  Ashland hired CPI to pay the maintenance fees on the patents assigned to Ashland Licensing and Intellectual Property LLC.  CPI continued to pay the maintenance fees after the foregoing patents were assigned to ASK.  The '168 Patent was the only patent that lapsed.

Plaintiff's counsel hired Brian A. Russell, CPA to provide an opinion as to the economic damages sustained by the Plaintiff as a result of an alleged breach of duty by the Defendant.  Mr. Russell prepared a report dated December 14, 2012 (attached as *"Russell Rpt."*) and was subsequently deposed regarding his report and opinions on February 18, 2013 (the transcript from which is attached as *"Russell Tr."*).  Mr. Russell's report fails to satisfy the exacting

1

standard for the admission of expert testimony under the Federal Rules of Civil Procedure or the Federal Rules of Evidence and controlling case law. Indeed, Mr. Russell's flawed and incomplete "analysis" is apparent from the report itself, as well as his subsequent deposition testimony.

Mr. Russell's opinions are not based on a proper factual foundation and, as such, are unreliable. As explained in detail below, Mr. Russell repeatedly parrots statements of ASK's employees and adopts them as his own opinions, even though he did nothing to independently verify the accuracy of this information. This unquestioning reliance upon the unverified, untested and potentially biased statements of Plaintiff's employees hardly rises to the level of "intellectual rigor" required by Federal Rule of Evidence 702 and the *Daubert* case and its progeny. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field.").

The unreliability of the opinions contained in Mr. Russell's report is largely based upon Mr. Russell's lack of experience in valuing patents, his failure to perform any independent investigation into the Japanese market for riser sleeves on which he opines, and his direct contradictions with case facts.

When pressed at his deposition to provide bases for his opinions, Mr. Russell was unable to point to any specific evidence and, in an apparent attempt to fill this analytical gap, retreated to his alleged "experience" or "expertise."[1] *See, e.g., Russell Tr.* at 65, 69, 71, 73, 79, 145, 146, 152, 153, 160 and 171. Mr. Russell's inability to point to specific evidence highlights the

---

[1] This is so even though Mr. Russell admitted he had never valued a patent, either U.S. or foreign patent. *See, e.g., Russell Tr.* at 52.

2

speculative and conclusory nature of his opinions. Mr. Russell is certainly not entitled to state

bottom-line opinions and conclusions based on nothing more than his *ipse dixit*. Mr. Russell

basically is asking the Court to "take his word for it." Such an approach is clearly improper. *See*,

*e.g.*, *Nelson, et al. v. Tennessee Gas Pipeline Co., et al.,* 243 F.3d 244, 254 (6th Cir. 2001);

*Tamraz, et al., v. Lincoln Electric Co., et al.,* 620 F.3d 665, 671 (3d Cir. 2010). ("The '*ipse dixit*'

of the expert alone is not sufficient to permit the admission of an opinion. *General Electric Co.*

*v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L.Ed.2d 508 (1997)…. '[N]o matter how good

an experts' credentials' may be, they are 'not permitted to speculate.' *Goebel v. Denver Rio*

*Grande W.R.R. Co.*, 215 F.3d 1083, 1084 (10th Cir. 2000)"). Here, as in the foregoing cases, Mr.

Russell's report falls far short of satisfying the requirements of Rule 702.

Accordingly, the Court should exclude the opinions expressed in the report of Mr.

Russell from the upcoming trial for the reasons disclosed in this Memorandum, including his

report is not based on sufficient facts and data and does not provide any reliable methodology to

arrive at his opinions.

## II.     THE RELEVANT LAW

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of

Evidence, as well as the *Daubert* decision and its progeny. Fed. R. Evid. 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto
> in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

As the Supreme Court has emphasized, district courts serve a gatekeeper function for expert

opinion testimony. *Daubert*, 509 U.S. at 597; *see also Nelson, et al. v. Tennessee Gas Pipeline*

3

*Co., et al.,* 243 F.3d at 252 ("While Kumho clarified that the trial court must determine what factors are pertinent to the reliability determination, it also reiterated the trial court's gatekeeping obligation and extended it to all expert testimony."); *Tamraz, et al.,* 620 F.3d at 668 ("The rule [Rule 702] gives district courts a "gatekeeping role" in screening the reliability of expert testimony, *Daubert*, 509 U.S. at 597…."). Furthermore, "the Court in Kumho clarified that this gatekeeper function applies to all expert testimony, not just testimony based upon science." *Johnson, et al. v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007). Importantly, "[t]he trial judge faced with a proffer of expert scientific testimony, must determine whether the expert

> is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue"

*Nelson, et al.,* 243 F.3d at 250-251, *citing Daubert* at 592-593; *see also* Fed. R. Evid. 702 advisory committee's note (2000 Amends). "It is the proponent of the testimony that must establish its admissibility by a preponderance of proof. *See Daubert*, 509 U.S. at 592." *Nelson, et al.,* p. 243 F.3d at 251.

Under Rule 702 and *Daubert*, the admissibility determination follows a two-prong framework. "To qualify as an expert, a witness must first establish expertise by reference to 'knowledge, skill, experience, training or education. Fed. R. Evid. 702…Second, Rule 702 requires a proffered expert to testify to 'scientific, technical or other specialized knowledge: FRE 702. As the *Daubert* Court noted, this requirement serves to establish a standard of 'evidentiary reliability' or 'trustworthiness.' *Daubert*, 509 U.S. at 591. As the Court explained:

> The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or

unsupported speculation. The term applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds. Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science. Indeed scientists do not assert that they know what is immutably "true" – they are committed to searching for new, temporary theories to explain, as best they can, phenomena. Science [thus]…represents a process for proposing and refining theoretical explanations about the world that are subject to further testing and refinement. But in order to qualify as "scientific knowledge" an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation – i.e., "good grounds," based on what is known.

Id. at 590 (internal quotation marks and citations omitted)." *Pride v. Bic Corporation,* 218 F.3d 566, 577.

Merely being qualified, however, is not enough to meet the reliability requirement. "This low threshold for making a [medical] decision serves well in the clinic but not in the courtroom, where decision requires not just an educated hunch but at least a preponderance of the evidence." *Tamraz, et al.,* 620 F.3d at 673. "[Q]ualifications alone do not suffice. A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert.*" *Clark v. Takata Corp.,* 192 F.3d 750, 759 n.5 (7th Cir. 1999). As Rule 702 provides, the expert testimony must be based on "sufficient facts or data," and the result of "reliable principles and methods" that are "applied reliably to the facts." Fed. R. Evid. 702. Accordingly, one of the "gatekeeping roles" of district courts is to "ensure that expert opinions presented to a jury are based on an adequate factual foundation." *See Daubert*, 509 U.S. at 597. Likewise, courts must "reject 'any subjective belief or speculation.'" *Ammons v. Aramark Uniform Serv. Inc.,* 368 F.3d 809, 816 (7th Cir. 2004). An expert must also "explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). "The important

thing is not that the experts reach the right conclusion, but that they reach it via a sound methodology. *Tamraz, et al.,* 620 F.3d at 675. (citing *Minix v. Canarecci,* 597 F.3d 824, 835 (7th Cir. 2010)) "Without any identified...methodology, a court cannot determine whether an expert's opinion is reliable." *Tober v. Graco Children's Products, Inc.*, 2004 U.S. Dist LEXIS 9010 at *3 (S.D. Ind. Mar. 4, 2004).

Courts have emphasized that "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Zenith Elec. Corp. v. WH-TV Broad. Corp.,* 395 F.3d 416, 419 (7th Cir. 2005). In addition, courts should exclude expert testimony if the analytical gap between the underlying facts or data and the conclusion is too great to put the expert's testimony before the jury. *See Cunningham v. Masterwear, Inc.,* 2007 WL 1164832, at *2 (S.D. Ind. Apr. 19, 2007) (citing *United States v. Mamah,* 332 U.S. 475, 478 (7th Cir. 2003)). In essence, an overarching goal of *Daubert* is "to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *See Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

It is well settled that an expert's report, by itself, must meet the requirements under Rule 702. *See, e.g.*, *Happel v. WalMart Stores, Inc.*, 602 F.3d 820, 825 (7th Cir. 2010) ("the proponent of expert testimony [must] disclose … a written report that contains, among other things, a 'complete statement of all opinions the witness will express and the basis and reasons for them.'"). In other words, the report must stand on its own. *See Gentieu v. Tony Stone Images/Chicago, Inc.*, 214 F.Supp.2d 849, 851 (N.D. Ill. 2002) (the expert's "report may be taken as gospel in the District Court's exercise of its *Daubert-Kumho* gatekeeping responsibilities."). Accordingly, an expert may not "cure deficient expert reports by supplementing them with later

deposition testimony." *See Pride,* 218 F.3d at 578; *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642-43 (7th Cir. 2007).

## III.  MR. RUSSELL'S REPORT DOES NOT CONFORM TO THE REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE - RULE 26

Mr. Russell's report is clearly deficient in meeting the requirements of an expert report prepared in accordance with Federal Rule of Civil Procedure 26(a)(2)(B):

(B) *Witnesses Who Must Provide a Written Report.* Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

At a minimum, Mr. Russell has failed to disclose all other cases in which during the previous 4 years he has testified as an expert at trial or by deposition and Mr. Russell has not provided a statement of the compensation he has been paid for the study and testimony in this case. (…"the court dismissed the Kovacics' case with prejudice pursuant to Fed. R. Civ. P. 41(b)…It held that Clemens's expert report of July 10, 2007 'patently' failed to comply with Fed. R. Civ. P. 26(a)(2)(B)…Affirmed,*" Kovacic, et al. v. Tyco Valves & Controls, L.P. et al.,* 433 Fed. Appx. 376, 379 (6th Cir. 2011).)

In addition,  Mr. Russell has not disclosed all the facts or data considered in forming his opinions.  Mr. Russell disclosed that he had discussions "with Lee Horvath, Sr. Vice President – Global Feeding Systems of ASK."  *Russell Rpt., page 3.* However, Mr. Russell never identified any information in his report, nor any opinion, as being based upon Mr. Horvath.  In over 47 instances (*Russell Rpt.* p. 9, l. 11 – p. 11, l. 7; p. 12, l. 10; p. 23, l. 4 - p. 24, l. 17, l. 20; p. 32, l. 24; p. 33, ll. 1-18; p. 54, ll. 4-14; p. 57, l. 17, l. 21; p. 58, l. 17, l. 18; p. 59, l. 5 - p. 60, l. 1; p. 62, l. 20; p. 63, l. 1; p. 65, l. 9, l. 14; p. 66, l. 8; p. 67, l. 20 - p. 71, l. 6; p. 72., l. 6, - p. 73, l. 5; p. 75, l. 16; p. 76, l. 16, l. 24; p. 79, l. 8; p. 80, l. 7; p. 108, l. 3; p. 109, l. 14, l. 20, l. 23; p. 125, l. 24; p. 134, l. 3 - p. 135, l. 3, l. 19; p. 136, l. 11 - p. 138, l. 22; p. 139, ll. 8-23; p. 144, l. 22 – p. 145, l. 3; p. 176, l. 20; p. 177, ll. 17-18; p. 178, l. 11; p. 183, l. 22) during his deposition, Mr. Russell referred to Mr. Horvath as the source of the information that Mr. Russell is relying upon in forming his opinion.[2]  For example:

1) Information from Horvath that was incorporated into Russell's schedules, *Russell Tr.* p. 9, l. 11 – p. 11, l. 7

Q. In general, can you describe the steps that you took to perform this assignment?
A. In general, I believe probably the -- the first or primary document that I reviewed was a _____ of Ashland Chemical that described the EXACTCAST sleeve market worldwide and the company's intentions or anticipation for how to deli- --- develop that particular market with a focus on the information that was projected for the Japanese market at that time.

I also met with another staff attorney, _____ to gather basic information to get an understanding of what a riser is and of what a riser sleeve is and how those are used in the -- the foundry industry or, you know, the -- the metal mold-pouring types of businesses.

After reviewing that basic underlying documentation, I was then provided a series of other financial documents and background information on the company.

---

[2]  In additional to violating Rule 26, Mr. Russell's failure to disclose in his report the data and information that form the basis of his opinions until his Feb. 18, 2013 deposition has severely disadvantaged the Defendant in that Mr. Horvath had already been deposed on Feb. 11 and 12, 2013 without Defendant's counsel knowledge of the specific areas that Mr. Russell intended on relying upon Mr. Horvath for support.

And after a preliminary review of that information, I then had a meeting here at the _____ law offices and a fairly lengthy teleconference with Lee Horvath from ASK to have him provide additional information and answer questions that I had after my initial analysis of the Japanese market information, projected sales and market penetration, profitability, and that kind of anticipated information.

That meeting was followed by a number of additional teleconferences and phone discussions with Mr. Horvath and -- detailing some of the -- the anticipated construction costs for putting a plant in a location near Japan, and also what the anticipated gross profit margins and operating profits would be for the anticipated Japanese market.

That information was then reduced to a financial schedule to determine the value of the patent, the -- the lost opportunity and the lost profits from that Japanese patent.

2) Expected gross profit, *Russell Tr.* p. 23, l. 4 – p. 24, l. 17

Q. Can you give me an example of some of these assumptions?
A. One of the assumptions, for example, would have been that the gross profit was anticipated to be at ___ percent of the sales price on particular products. And that -- that assumption was used after reviewing ASK internal projection documents that I believe were for the years _____ that anticipated a ___ ercent gross profit margin that was significantly less than the _____ that had anticipated a gross profit margin of, say, ___ percent that I think was the -- the original estimate done by Ashland Chemical. So those kind of discussions were held.

I had the discussions with Mr. Horvath. And his information provided to me was that their experience and the more reasonable gross profit margin would be ___ percent rather than the original anticipated ___ percent.

We also discussed the comparison of the original _____ that anticipated Ashland, later ASK Chemical, to eventually develop a ___ market share in Japan. And after discussions with Mr. Horvath, it was his opinion, with my agreement, that that may have been a _____ estimate, and that the -- the company had gathered about a ___ to ___ ercent market share in North America.

We weren't certain that a _____ market share was possible in Japan, and agreed that eventually reaching a _____ market share would be more reasonable, and understanding a -- a time frame to get up to that ___ ercent market share. Those were some of the assumptions.

3) Expected market share in Japan, *Russell Tr.* p. 24, ll. 18-25

Q. How was the _____ figure obtained?

9

A.  Based on Mr. Horvath's understanding of the market through Shigeo and what they believe they could penetrate in the market.

Q.  Did -- Did you ever talk to Mr. Shigeo?

A.  I did not.

4) Competitive riser sleeve products in Japan, *Russell Tr.* p. 32, ll. 17-25 and p. 33, ll. 1-18

Q.  Would it be important to know whether another -- whether or not -- someone else's riser sleeve that provided the same benefits to an end user that are provided in the '168 patent in this -- in this consideration?

A.  During my discussions with Mr. Horvath -- Horvath, his description to me was that there was not a competing product that was -- that would compete with this particular quality and the specific attributes of this patented product.

Q.  Did you do anything else to find out if there wasn't a competing product?

A.  I did not.

Q.  Should you have?

A.  I don't believe so. I believe the representations of Mr. Horvath were reasonable. And it's reasonable for patented technology to assume that it's unique enough, based on its patent, to provide a -- a unique market for that particular product.

Q.  So you don't really know if there was a competing product available in Japan during that time?

A.  No, I do not have direct knowledge of that.

5) Capital expenditures, *Russell Tr.* p. 54, ll. 4-14

Q.  And tell -- tell me if I'm incorrect, that you said you did not do any cost estimating in this particular project.

A.  I -- To clarify my answer, I was provided the estimate of the[ ]capital project cost for a plant in[ ]o service the Japanese market. That estimate was provided by Mr. Horvath in a document that I had received from them when they were doing some capital budgeting. So that is what I relied upon.

6) General market info, the [ ], market share, cost and profit margins, capital expenditures, tooling, *Russell Tr.* p. 59, l. 6 – p. 60, l. 1

Q.  What subjects did you discuss with Mr. -- Mr. Horvath?

A.  Primarily, financial subjects that -- you know, the -- the first initial conversation was to review and discuss some of the general market information and data that was contained in the [ ]. We also had discussions as to what that plan's initial estimate for gaining a share in the Japanese market were compared to what updated forecasts had been prepared, and scaling that original estimate of [ ] of the market back down to a [ ] estimate.

10

Also discussions related to the direct cost and gross profit margins, operating margins, the amounts of anticipated capital expenditures for developing a plant, capital expenditures for tooling. That's pretty much the context of the discussions that we had.

7)  Understanding of EXACTCAST and riser sleeves, benefits, how manufactured, cold-box methodology, dimensional integrity, etc., *Russell Tr.* p. 60, l. 2 – p. 63, l. 19

Q.  Please tell me everything you remember about what Mr. Horvath told you regarding each of these subjects. And let's start first with the -- the financial subjects relating to the

A.  In general, I think there was probably two key factors that most of the discussions centered around, and that was what the estimate of the overall global market was, and the Japanese share of that market, and the anticipated market share that Ashland Chemical had originally estimated at the

Q.  Can you --

A.  That --

Q.  Can you give me further details about this -- about your conversation regarding that

A.  We discussed just the market in general. Again, what the -- you know, there was a -- some discussion with Mr. Horvath, again, describing the EXACTCAST sleeve itself, so that I had a better general understanding of what a riser was and what a riser sleeve was and giving me that background kind of an information. What the specific benefits of that product were.

We discussed, you know, how it was manufactured, and the -- you know, the -- the aggregate that was used. And the fact that it was a -- what he described as a cold-box methodology of manufacturing the sleeve where gases were passed through the particular aggregate material to -- with the aggregate -- binder added to the aggregate, then a gas, argon and any other number of com- -- combined gases, that create this cold-box manufacturing process of the riser sleeve, and his description as to the benefits that were created from that.

It's fiber-free so that there weren't, you know, the incidents of health hazards related to loose fibers in the manufacturing process. The dimensional integrity of the riser sleeve itself, because of not having to go through a heated manufacturing process, that it would keep its exact shape, part -- hence part of the name for the EXACTCAST.  We discussed those kinds of attributes. How it was used in application itself.

Then we also -- there was some amount of review of the Japanese market -- and I'm trying to refer to the specific page it was on. As part of Defendant's Exhibit 7, it would be Page ASK 919 or the EXACTCAST sleeve productions -- projections for the Japanese market.

11

And we went through this document in some detail and really updated the information as to what the original assumptions were by Ashland Chemical. One being that Ashland had estimated that they would be generating _____ worth of sales by the _____ We didn't -- And that was under the assumption of a _____ percent market share that's listed at the top of the projection. We discussed that. Mr. Horvath didn't feel that was obtainable in the current market.

Also reviewed the gross profit percentage that was originally anticipated at _____ percent and the -- the understanding by Mr. Horvath as we reviewed their historical experience that they were actually achieving about a _____ gross profit margin, so that this -- the original _____ overestimated the actual profit margin itself.

The operating expenses at _____ percent, he felt, were relatively in line, but some of them would be reduced, and I believe to his estimate of a _____ percent operating expense.

And the original projected operating profit at _____ percent, when we revised the gross margin at _____ and the operating expenses at _____ percent, rather than forecasting a _____ operating profit margin, that we felt -- he felt that a _____ percent operating margin was more realistic.

8) Operating margins, but Russell doesn't know who at ASK did the analysis of _____

_____, *Russell Tr.* p. 67, l. 20 – p. 71, l. 6

Q. And you also said that you talked to him about the direct cost and margin. Can -- can you -- Can you explain everything that you discussed with him regarding that subject?

A. Yes. As I previously stated, when we were reviewing the _____ -- when I use the word "margin," I'm referring to either a gross profit percentage or an operating profit percentage. Those percentages themselves are, by accountants, described as margins.

So the -- my discussions with Mr. Horvath were to gather information as to what their current gross margins were rather than the _____ that was originally anticipated in the _____ . And in reviewing their current profit margins, gross margins, and the other areas, they were at _____

So that based on that historical data, I believe _____ percent was a more appropriate gross margin to use than the original _____ margin that was anticipated back in the _____

The same thing with operating expenses at a _____ of sales rate and which results in an operating profit of _____ of sales.

Q. Now, when -- when you -- when you had these discussions with Mr. Horvath, was this done on a yearly basis, or was it done cumulatively?

A. It was done on what they were averaging from a           time frame of an analysis that they had prepared.

Q. And you say "they," who -- who is they?

A. ASK -- ASK Chemical. I don't know if it was Mr. Horvath personally, or if it was part of their accounting staff, or who the specific individual was that prepared it.

Q. Were there -- did you have any -- did -- Did you have any questions about whether what he was telling you was -- was accurate?

A. No. It -- it -- It was consistent with my professional experience, not only as a business valuator, but, you know, I have 30 to 40 percent of my actual practice is still corporate and individual tax return preparation. I have a number of corporate clients that are financial statement clients.

    And the gross profit margins for specialty kinds of manufacturers, it's common for those gross profit margins to be anywhere from          percent. I mean, they're -- it's common within those industries, the more value-added you're putting into a particular product, the larger those profit margins tend to be.

    So for a -- a very specialized manufacturer of, you know -- my understanding of this patented technology was that the market and the customers for the EXACTCAST product were companies that were not buying this product based on what I would describe as commodity type pricing.

    The -- My understanding from Mr. Horvath and our discussions about it is that it's a premium product that reduces the casting errors, it -- it makes the casting company more efficient because they have less of a rejection rate, and for numbers of other factors that it makes them more efficient, that they are willing to pay premium pricing for the EXACTCAST product itself, those riser sleeves.

    And for any kind of specialty manufacturing with a -- a high-end product, a -- a         gross profit margin was consistent with my experience. And the same thing with the -- you know, a -- a pretax operating profit of        was not unreasonable based on my professional experience.

9) The number of Japanese customers that would be developed over a period of time,

*Russell Tr.* p. 75, l. 16 – p. 76, l. 16

Q. Now, who -- who made this determination of how many customers would be developed over -- over periods of time?

A. Mr. Horvath.

Q. And do you know where he got his information?

A. I believe that was through his discussions and information that he received through Shigeo Negoro, their director of commercial sales in Japan. I can't recall his --

Q. You –

13

A. -- exact title, but I know he's their local Japanese executive.

Q. Did -- did -- did -- Did Mr. Horvath  tell you this, or is this -- is this your assumption?

A. No. Mr. Horvath told me at least during one of our conversations, when I asked about a certain financial projection or one piece of information, I know at least on one occasion he mentioned that that information had been provided to him by Shigeo. I don't recall each individual component specifically of information that Mr. Horvath either had compiled himself or got directly from Shigeo.

10) Direct materials and labor costs, *Russell Tr.* p. 134, l. 13 – p. 135, l. 3

Q. Referring back to your report, which is D -- D 49, if you go to '_____., I'm referring to "_____," who specifically provided you the information that costs of sales an- -- is anticipated to run approximately percent of sales?

A. Through both Mr. Horvath and in reviewing the historical financial information of the company. So there was some that was provided directly from Mr. Horvath and other schedules that I reviewed to look at what their historical gross profit margins were that I -- I'm not sure who specifically the individual was at ASK Chemical that provided those, but...

11) Operating expenses, *Russell Tr.* p. 136, l. 11 – p. 137, l. 13

Q. Who specifically provided you the information that operating expenses are estimated at _____? 

A. Mr. Horvath.

Q. Did you provide any independent verification of this information?

A. Yes, based on just my general experience in working with manufacturers of, you know, specialty manufacturing; and having had the experience that gross profit margins for those kinds of entities are generally in a _____ range, and operating expenses are, you know, anywhere from a _____ range.

I mean, the -- they were projections by -- or, estimates by Mr. Horvath, but they reconciled to my experience as to what I have seen in profitability and profit margins for specialty manufacturers.

Q. Was it -- did you review any -- Did you review any specific documents or input for your independent verification?

A. No specific documents other than I will have to get you a reference to the ASK Chemical historical schedules that showed gross profit margin, but I -- I don't know the Bates stamp reference off the top of my head.

12) The cost of building a plant ir _____, *Russell Tr.* p. 139, ll. 8-23

Q. Did this document to which – to which you just referred relate to _____?

A. I believe that was part of the original basis. It was a -- a document that they had originally prepared for an _____ roduction facility, and it was -- the

14

information that I was provided by Mr. Horvath was that it would cost approximately ▨▨▨▨ of the cost that it had for the ▨▨▨▨▨▨▨ plant for this plant in ▨▨▨▨

Q. And did you make any independent verification that this one-half cost was accurate?

A. I did not.

13)  Tooling investment required in ▨▨▨▨, *Russell Tr.* p. 144, l. 22 – p. 145, l. 3

Q. Who specifically provided you the information that the tooling investment would be approximately ▨▨▨ from ▨▨▨ to ▨▨?

A. Mr. Horvath.

Q. Did you provide any independent ver- -- verification of this information?

A. I did not.

Beyond blindly accepting the unverified representations of Mr. Horvath, an employee of the plaintiff, Mr. Russell also did not consider Mr. Horvath's area(s) of expertise nor Mr. Horvath's experience with the subject riser sleeves:

I previously said I'm not aware of Mr. Horvath's specific expertise. *Russell Tr.* p. 177, ll. 17-18.

Mr. Russell was utilizing Mr. Horvath as a source of information related to the manufacturing of riser sleeves as well as the interpretation of a ▨▨▨▨▨▨ prepared by Ashland Chemical Co., among other subjects.  However, Mr. Horvath testified "I first started working with that particular product line in 2009 when I took control of that product line." *Horvath Tr.* p. 19, ll. 14-16.  Mr. Horvath also does not directly oversee the manufacturing of riser sleeves nor the marketing of riser sleeves in Japan.  Given Mr. Horvath's limited tenure with the subject riser sleeves, Mr. Russell's complete reliance on unverified information obtained from Mr. Horvath is highly speculative.

In addition, beyond not identifying the specific issues Mr. Russell was relying upon Mr. Horvath, Mr. Russell also failed to identify the Plaintiff's law firm as a source of information that he reviewed and relied upon in forming his opinions. If fact, one of the attorneys from ASK's law firm wrote portions of Mr. Russell's report. *Russell Tr.* p. 25, ll. 11-20

15

> Q. Did -- Did anyone from the             write -- write any portions of the report?
>
> A. There were portions of some of the original market background information, information from Modern Casting, a -- a trade publication, that had been pulled together and provided by          that I incorporated into my report.

Compounding this lack of authorship issue, Mr. Russell was unable to identify the source of the material that the          had pulled together:

> Q. So all of the information that you got, you received from Mr. Horvath?
>
> A. The -- I believe some of the marketing -- market information came from the         . As far as what the other current market size itself was, I don't know if that was provided to them through Mr. Horvath, or if it had been independently obtained. And I asked for sources of market information, and I was provided with the Modern Casting magazine articles and some information as to the overall market size.

It is well settled that Mr. Russell's report must stand on its own and "Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony." *See Pride*, 218 F.3d at 578; *Ciomber*, 527 F.3d at 642-43 (7th Cir. 2007). This is precisely the type of "take my word for it" approach that courts, as gatekeepers, must reject. *See, e.g., General Electric Co.*, 522 U. S. at 150-151 ("nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

## IV.  MR. RUSSELL IS NOT QUALIFIED TO OFFER OPINION TESTIMONY ON THE VALUE OF A FOREIGN PATENT OR ANY LOST PROFITS ASSOCIATED WITH SAID PATENT

Pursuant to Federal Rule of Evidence 702, Mr. Russell is wholly unqualified to testify on the issues relating to the value of a foreign patent, or for any lost profits allegedly experienced by the Plaintiff in connection with said foreign patent, for which he has been designated.

First, Mr. Russell lacks any real-world experience valuing patents. He is offered by the Plaintiffs as a witness to opine on the value of the Japanese patent, yet has absolutely no

experience outside of litigation to draw from in order to offer such opinions. Mr. Russell describes his experience in the following manner:

> Mr. Russell has valued hundreds of businesses since 1989, with a concentration of work in divorce engagements. His work also includes business valuations for ESOPs, family limited partnerships, estates and gifts, buy-sell agreements, dissenting shareholder actions, mergers and acquisitions and strategic planning. Mr. Russell has also performed financial and economic analysis of damage claims for business interruptions, patent infringement, and employment termination matters. *Russell Rpt., page 12.*

In fact, the majority of Mr. Russell's work experience is performing business valuations that are part of divorce engagements. (*Russell Tr.* at pages 47 – 48).

In particular, Mr. Russell has (1) never been retained to value a patent outside the context of a litigation matter *(Russell Tr.* at p. 52, ll. 7-12), (2) never performed any type of engagement that involved the sale of a product in Japan (*Russell Tr.* at p. 52, ll. 24-25 and p.53, ll. 1-2), and (3) never performed any type of engagement that involved a process patent *(Russell Tr.* at p. 53, ll. 3-5). Thus, Mr. Russell is being offered to opine on matters that require the very experience he lacks.

In addition, within the context of litigation, Mr. Russell's experience related to patents is limited to "probably two to four different projects."[3] *(Russell Tr.* at p. 48) Mr. Russell has never provided expert testimony at trial regarding economic damages associated with patent infringement.[4]

---

[3]    Later, in attempting to name the specific patent infringement cases Mr. Russell has previously been involved with, Mr. Russell named cases involving          and "there's a fourth or fifth that I can't recall." *(Russell Tr.* at 48)

[4]    Of the patent infringement cases named by Mr. Russell, the         case in the only one in which Mr. Russell provided expert testimony. Upon further review by Defendant's counsel, the case Mr. Russell is referring to is     a case filed in the Franklin County Court of Common Pleas in 2006 asserting claims for misappropriation of trade secrets, conversion, breach of contract, breach of fiduciary duties, and unjust enrichment, but no allegations of patent infringement.

Second, Mr. Russell is being asked to interpret and opine on technical subject matter relating to extremely complex technology, namely the process for making exothermic riser sleeves. But Mr. Russell has no basis to interpret or understand the technical testimony and documents involved in this case. He has no technical degree, as an engineer or otherwise. He has no employment experience in the industry. He has no training or other ability that would allow him to shed any light on the technical evidence or the patent-specific knowledge *(Russell Tr.* at p. 54, l. 17 – p. 56, l. 14) that is required to value the subject patent. Indeed, he has no greater expertise to understand the technology or the specific patent-related factors at issue (claims, validity, etc.)  and to reach any conclusions regarding these issues than the jury itself. As such, his "opinions" violate one of the fundamental tenets of Federal Rule of Evidence 702 – i.e., to "assist the trier of fact to understand the evidence or to determine a fact in issue." *See also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993).

Mr. Russell lacks any "scientific, technical, or other specialized knowledge" that will assist the trier of fact. Fed. R. Evid. 702; Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). Thus, Mr. Russell should be precluded from testifying as an expert on the issue of economic damages.

## V.    MR. RUSSELL'S REPORT LACKS SUFFICIENT FACTS OR DATA AND HIS OPINIONS ARE SPECULATIVE AND UNRELIABLE

Notwithstanding the complexity of the damage issues in this case and the numerous issues surrounding the riser sleeve technology at issue, Mr. Russell's report contains citation to: (1) at most a scant twenty documents; (2) unrecorded and unverified "discussions" with a single ASK  employee; and (3) three internet sites (including Wikipedia) as support for every one of his "opinions." *See generally Russell Rpt.* The lack of documentary support for Mr. Russell's opinions is further exacerbated by the undisputed fact that he did not perform any independent

18