verification of the numerous significant issues at-hand where he simply accepted what he was told by the Plaintiff or the Plaintiff's counsel. *See, e.g., Section III of this report*. Mr. Russell's reliance on the unverified statements of Plaintiff's employee and Plaintiff's counsel, coupled with an incomplete and inadequate damage methodology clearly does not meet the standards mandated under Rule 702. *See* Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 597 ("Rule 702 gives trial courts a 'gatekeeping role' to ensure that expert opinions presented to a jury are based on an adequate factual foundation."); *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) ("experts' work is admissible only to the extent that it is … founded on data."). Due to the complete lack of evidentiary support, the entirety of Mr. Russell's Report should be excluded and Mr. Russell should not be permitted to testify at trial.

> A.     **The Bulk Of Mr. Russell's Report Is Comprised Of Opinions Of ASK Employees Or ASK's Counsel, Not Mr. Russell, And Were Accepted Without Independent Verification**

"When an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded." *King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, 2009 U.S. Dist. LEXIS 96131, *4 (S.D. Ind. September 29, 2009) (citations omitted). Plaintiff ASK is asking the Court to allow Mr. Russell, "under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions Mr. Russell purports to base his opinion." *See Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D. Ill. 2005). This is clearly improper expert testimony. *See also Hot Wax, Inc. v. Warsaw Chemical Co.*, 45 F.Supp.2d 635, 639 (N.D. Ill. 1999) (excluding hearsay statements from party employees dressed up to look like expert testimony); *Aponte v. City of Chicago*, 2011

U.S. Dist. LEXIS 52130 *6-8 (N.D. Ill May 12, 2011) (opinion stricken because "expert" simply regurgitated facts favorable only to one party).[5]

The "opinions" recited in the Report of Mr. Russell are nothing more than those of the Plaintiff, ASK, or the Plaintiff's counsel. For example:

1) When Mr. Russell was asked why he had assumed that ASK would achieve a gross margin on the allegedly lost future sales of riser sleeves, Mr. Russell replied:

> I had the discussions with Mr. Horvath. And his information provided to me was that their experience and the more reasonable gross profit margin would be _____ rather than the original anticipated _____. *Russell Tr. at page 23.*

The ____ figure Mr. Russell is referring to is from a _____ prepared by Ashland Chemical Co., an entity that is not a party to this litigation, that Mr. Russell utilized to estimate various financial parameters used in his economic damage analysis for an economic damage period commencing ____ years later (_____). Mr. Russell merely relies upon the statements of Plaintiff's employee, Mr. Horvath, and performs no independent verification or analysis of this information in order to assess its appropriateness for use in an economic damage analysis covering the time period of 2013 through 2022. *Refer to Russell Rpt., Schedule 1.*

2) Mr. Russell describes his source of information regarding the anticipated market penetration of the Japanese market with the subject ASK riser sleeve as Mr. Horvath:

> We also discussed the comparison of the original _____ that anticipated Ashland, later ASK Chemical, to eventually develop a _____ market share in Japan. And after discussions with Mr. Horvath, it was his opinion, with my agreement, that that may have been a relatively high estimate, and that the – the company had gathered about a ____ to _____ market share in North America. *Russell Tr. at 24.*

---

[5]    *See also Lang*, 217 F.3d at 924; *LG Elecs v. Whirlpool Corp.*, 2010 U.S. Dist. LEXIS 91739, *16 (N.D. Ill. September 3, 2010).

The      market share in Japan figure Mr. Russell is referring to is from the previously described            prepared by Ashland Chemical Co., a document that Mr. Russell utilized to estimate various financial parameters used in his economic damage analysis for an economic damage period commencing    years later (       . Mr. Russell merely relies upon the statements of Plaintiff's employee, Mr. Horvath, and performs no independent verification or analysis of this information in order to assess its appropriateness for use in an economic damage analysis covering the time period of 2013 through 2022. *Refer to Russell Rpt., Schedule 1.*

Compounding this lack of independent expert assessment of the inputs utilized in his economic damages model, Mr. Russell provides further explanation as to the source of the    figure:

> Based on Mr. Horvath's understanding of the market through Shigeo and what they believe they could penetrate in the market. *Russell Tr. at 24.*

Regurgitating second-hand information that an ASK employee, Mr. Horvath, allegedly obtained from a person that is not an employee of the Plaintiff (Mr. Shigeo is the Marketing Leader for ASK Chemicals Japan Co. Ltd) is not the role an expert plays at trial.

3) Mr. Russell relies upon Mr. Horvath to supposedly establish that there was not a product within the Japanese marketplace that would compete with the particular quality and specific attributes of the ASK riser sleeve at issue: (*Russell Tr.* at 32-33)

> Q. Would it be important to know whether another -- whether or not – someone else's riser sleeve that provided the same benefits to an end user that are provided in the '168 patent in this -- in this consideration?
> A. During my discussions with Mr. Horvath -- Horvath, his description to me was that there was not a competing product that was -- that would compete with this particular quality and the specific attributes of this patented product.

21

> Q.  Did you do anything else to find out if there wasn't a competing product?
> A.  I did not.

Mr. Russell has no personal knowledge of competing products in Japan. *Russell Tr.* at

page 33:

> Q. So you don't really know if there was a competing product available in Japan during that time?
> A. No, I do not have direct knowledge of that.

Clearly, any lost profits analysis requires knowledge of the marketplace and how the

Plaintiff's product would compete with other products in the subject marketplace.

Mr. Russell merely relies upon the statements of Plaintiff's employee, Mr. Horvath,

and performs no independent verification, investigation, or assessment of this

information.

4)  Other examples of Mr. Russell accepting information from Mr. Horvath without

performing any independent verification include:

> i.  *Russell Tr.* p. 68, l. 25 – p. 69, l. 23:

> Q. Now, when -- when you -- when you had these discussions with Mr. Horvath, was this done on a yearly basis, or was it done cumulatively/
> A. It was done on what they were averaging from a [ ] time frame of an analysis that they had prepared.
> Q. And you say "they," who -- who is they?
> A. ASK -- ASK Chemical.  I don't know if it was Mr. Horvath personally, or if it was part of their accounting staff, or who the specific individual was that prepared it.
> Q. Were there -- did you have any -- did -- Did you have any questions about whether what he was telling you was -- was accurate?
> A. No.  It -- it  It was consistent with my professional experience, not only as a business valuator, but, you know, I have 30 to 40 percent of my actual practice is still corporate and individual tax return preparation.  I have a number of corporate clients that are financial statement clients.

ii. *Russell Tr.* p. 72, l. 6 – p. 73, l. 5:

    Q. -- their costs?
        You also said -- The third thing you said you discussed with Mr. Horvath was the capital expenses for -- I guess for the plant and for tooling.
    A. Correct.
    Q. Can you just -- just tell me everything you discussed in that respect.
    A. I was given a copy of a -- a         document that was a        that had been prepared by ASK Chemical that I reviewed with Mr. Horvath, and I used that for my assumptions for the       for putting a plant in     .
        And then there was limited information -- I don't recall if there was any information specifically in the plan as to the amount of      itself that would be needed, but Mr. Horvath provided me the estimate of cost for     .
    Q. Did you question – Were there any questions that you had regarding the report that he had given you, this summary report?
    A. No. It appeared reasonable to me.

iii. *Russell Tr.* p. 80, l. 15 – p. 81, l. 2:

    Q. Let's go to Section D.1. of your report on Page 3. Where did this information come from?
    A. Just from the ASK Web site. I mean, there is a footnote reference.
    Q. Did you do any independent work to assess the reliability of this information?
    A. I did not. This is general background information that is part of the narrative discussion, does not have a direct impact on the -- the calculations or the estimates of damage.

iv. *Russell Tr.* p. 136, l. 11 – p. 138, l. 22:

    Q. Who specifically provided you the information that the capital expenditures necessary to build a production facility in      would be     ?
    A. That was provided by Mr. Horvath. There was a summary plan description of an anticipated plant production that he provided.
    Q. Was this a document?

23

A. Yes.

Q. And that was a document that -- that he prepared or he had prepared?

A. It was a document that Mr. Horvath provided to me; I believe it had been prepared by part of the ASK Chemical management team. I -- I don't know if Mr. Horvath himself personally prepared it.

Q. But -- But it was an -- ASK Chemicals –

A. Yes, it was.

Q. -- LP's document?

A. Yes.

Q. Did you provide any independent verification of this information?

A. I did not.

v. *Russell Tr.* p. 139, ll. 8-23:

Q. Did this document to which -- to which you just referred relate to _____?

A. I believe that was part of the original basis. It was a -- a document that they had originally prepared for an production facility, and it was -- the information that I was provided by Mr. Horvath was that it would cost approximately _____ of the cost that it had for the _____ plant for this plant in

Q. And did you make any independent verification that this _____ was accurate?

A. I did not.

vi. *Russell Tr.* p. 144, l. 22 – p. 145, l. 3:

Q. Who specifically provided you the information that the _____ would be approximately _____ from _____?

A. Mr. Horvath.

Q. Did you provide any independent ver- -- verification of this information?

A. I did not.

Mr. Russell took no steps to independently verify the accuracy of the statements made by ASK 's counsel, such as through independent testing or by interviewing more than merely one ASK employees. *See, e.g., Russell Tr.* at p. 32, l. 17 – p. 33, l. 18; p. 34, ll. 13-20; p. 63, l. 20 - 64, l. 17; p. 65, l. 1 – p. 66, l. 9; p. 80, l. 15 – p. 81, l. 2; p. 98, l. 15 – p. 99, l. 6; p. 106, l. 9 – p.

24

l07, l. 10; p. 108, l. 7 – p. 109, l. 1; p. 110, l. 9 – p. 111, l. 18; p. 133, l. 9. – p. 134, l. 12; p. 134, l. 13 - p. 138, l. 22; p. 139, ll. 18-23; p. 143, l. 25 – p. 145, l. 3; p. 174, l. 5 – p. 175, l. 13.  Courts have routinely excluded testimony paralleling Mr. Russell's, finding such testimony to be unreliable "because of [] unquestioning reliance on what [plaintiff] told him as the basis for his various conclusions and because it appears clear from [the expert's] submissions that various of his conclusions are without sufficient factual underpinning to pass the required 'reliability' test." *See Gentieu*, 214 F.Supp.2d at 853 (N.D. Ill. 2002); *see also King-Indiana Forge*, 2009 U.S. Dist. LEXIS at *4 ("when an expert relies upon information given to him by a party or counsel, he must independently verify that information before utilizing it in his calculations"); *MDG International, Inc. v. Australian Gold, Inc.*, 2009 U.S. Dist. LEXIS 55652, *18 (S.D. Ind. June 29, 2009) (the expert's "report fails to meet this standard because his mistaken assumptions and his failure to verify key facts are errors of methodology that render his resultant opinions unreliable.").

The *Gentieu* court emphasized that: "given the wealth of experience and know-how to which [the expert] points as the predicate for allowance of his evidence, he might have been expected to do some of his own vetting of [the plaintiff's] information before he launched on the opinions he has generated. That type of verification would have placed [the expert] on far better paper (both literally and figuratively) in terms of his hoping to meet the *Daubert-Kumho* reliability standard." *Id.*; *see also King-Indiana Forge*, 2009 U.S. Dist. LEXIS at *5 ("Although [the expert] conducted the interview of [the employee], he never independently verified the facts [the employee] provided to him. Instead, he simply offered [the employee]'s conclusions as his own.").

Mr. Russell's failure to perform an independent investigation is especially troubling here given that these individuals, as a current employee of Plaintiff and an attorney representing the Plaintiff in this very matter, are very likely biased. Mr. Russell's reliance on the unverified statements of Plaintiff's employee and Plaintiff's counsel, coupled with an incomplete and inadequate damage methodology clearly does not meet the standards mandated under Rule 702. *See* Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 597 ("Rule 702 gives trial courts a 'gatekeeping role' to ensure that expert opinions presented to a jury are based on an adequate factual foundation.") *Havard v. Baxter Int'l Inc.,* 2000 Dist. LEXIS 21316, 7 (N.D. Ohio 2000) ("A court may concluded that there is simply too great an analytical gap between the data and the opinion proffered for the opinion to be admissible," *citing General Electric Co.,* 522 U.S. at 146, 139 L.Ed.2d 508 (1997)). Due to the complete lack of evidentiary support, the entirety of Mr. Russell's Report should be excluded and Mr. Russell should not be permitted to testify at trial.

Given its cursory nature of Mr. Russell's work discussed above, it is clear Mr. Russell's lack of effort in verifying information exemplifies the lack of "intellectual rigor" required in expert testimony. *Kumho Tire Co.*, 526 U.S. at 152.

**B.    Mr. Russell's Methodology And Assumptions Are Inconsistent With Case Facts**

The "opinions" recited in the report of Mr. Russell are based upon implementing a methodology, with associated assumptions, that are completely inconsistent with case facts. For example:

1)  Mr. Russell assumes that ASK Chemical LP sells riser sleeves in Japan and has 16 manufacturing plants.

26

According to Mr. Russell, ASK Chemical LP, the plaintiff in this litigation, is currently active in 24 countries with 30 locations, has 16 production plants worldwide and a total of approximately 1,800 employees -  *Refer to Russell Rpt., page 3.*

1. ASK Chemical LP

Founded in 2010, ASK is already a major global player as a supplier of chemicals and materials in the world's foundry industry. ASK's principal place of business is in Dublin, Ohio, but is currently active in 24 countries with 30 locations, has 16 production plants worldwide and a total of approximately 1,800 employees.

In July 2010, Ashland, Inc. and Süd-Chemie AG reached a contractual agreement on the formation of a global joint venture to merge their business activities in the foundry chemicals sector.  The joint venture is known as ASK Chemicals GmbH and is headquartered in Hilden, Germany.   Ashland, Inc. and Süd-Chemie AG each hold a fifty-percent interest in the joint venture with Süd-Chemie providing the operations management leadership.  Graphically:



ASK Chemicals GmbH and ASK Chemicals LP Relationship

27

ASK Chemicals GmbH has 30 subsidiaries in 25 countries including ASK Chemicals Japan Co. Ltd., located at 50, Ota-Machi 4-Chome; Naka-Ku, Yokohama, Japan.

The Plaintiff in this litigation, ASK Chemicals LP is limited partnership formed under the laws of the state of Delaware with a principal place of business in Dublin, Ohio.  When the formation of the new global joint venture ASK Chemicals GmbH closed on November 30, 2010, ASK Chemicals LP had already been part of an existing                    European-based joint venture between Ashland, Inc. and Süd-Chemie AG called Ashland-Südchemie-Kernfest GmbH. Ashland-Südchemie-Kernfest GmbH (as well as its limited partner ASK Chemicals LP) and two other business units became part of the global joint venture ASK Chemicals GmbH.  *Refer to previous graphic.*  See publicly available Annual Report 2012 of Ashland, Inc., Note C, p. F-17, copy attached.

Mr. Horvath, in his deposition, describes ASK Chemicals LP, confirming that Mr. Russell is inaccurate in his description of ASK Chemicals LP.  *Horvath Tr., p. 216, ll. 1-14*

> Q.  Which has two manufacturing sites?
> A.  The -- The U.S. LP entity.  ASK Chemicals, LP has two manufacturing sites.
> Q.  In Cleveland?
> A.  Yes.
> Q.  Now, the -- these -- do these manufacturing sites, do they sell riser sleeves?
> A.  Do they sell riser sleeves?
> Q.  Yes.
> A.  No.
> Q.  What do they do?
> A.  They produce binders, refractory coatings, and other auxiliary products.

The entity that Mr. Russell is providing the information on is ASK Chemicals GmbH, and not ASK Chemicals LP, as he erroneously states in his report.  Obviously, Mr. Russell's methodology, incorporating his misunderstanding of the resources available to ASK Chemicals LP, does not fit the case facts.  Mr. Russell does not know how this misunderstanding impacts his damage calculations.  *Russell Tr.* p. 88, ll. 6-17

28

Q. Excuse me. I -- I -- I said that incorrectly. Is this important in forming an opinion on economic -- economic damages what the -- what the Plaintiff in this action might be entitled to?

A. I don't know the impact on how these profits are being split with the Plaintiff. And if -- if -- the anticipated market and those profits that I believe that ASK, LP, was entitled to, then it would have an impact on the damage calculations.

In the analogous situation involving patent-holding companies, it has been determined that if the patentee is not selling a product, by definition there can be no lost profits. *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286 (Fed. Cir. 2007); *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1311 (Fed. Cir. 2004); *Rite-Hite Corp. v. Kelley Co.,* 56 F.3d 1538 (Fed. Cir. 1995).

2) Mr. Russell assumption regarding the rights granted by a patent is incorrect.

Mr. Russell's understanding of a patent is a legal document that gives the patent holder certain rights to utilize that patent. Mr. Russell described his understanding of these rights as follows:

*Russell Tr.* p. 29, ll. 13-23

Q. I have a few questions regarding the second part of -- of your statement – of that statement. Is it your opinion that the abandonment of the patent deprived ASK the benefits of the patent, or was that an assumption you -- that you were asked to make?

A. I believe it's an assumption. It's a critical assumption to the overall analysis.

*Russell Tr.* p. 30, ll. 14-23

Q. And my question is: What are the benefits that you are referring to in this statement?

A. The benefits that I am referring to would be the exclusive right of ASK Chemical to produce and take to market the patented EXACTCAST sleeve product itself. So it's the benefits which would flow as economic benefits, which would result from the sale of that particular product.

3) Mr. Russell assumes that ASK will not enter the Japanese market – *Russell Tr.* p. 33, ll. 19-25 and p. 34, ll. 1-12

Q. Is it your opinion that not having the patent at issue in this case will preclude ASK from entering the Japanese riser market?

29

A. Based on my understanding and discussions with Mr. Horvath, I -- I don't believe that ASK now sees that it would necessarily be worth the financial risk to go ahead and attempt to enter that market without having the patent.

Q. So it is your understanding that ASK is not going to attempt to enter that – the riser market in Japan at this time?

A. I don't know. I don't believe there were plans of that. They had continued to provide samples and I had documents on those -- actually, I -- I am speculating to answer that question. I -- I don't know if they intend to or not without the patent.

However, Mr. Horvath testified that ASK may have sales

*Horvath Tr.* p. 425, ll. 17-25 and p. 426, l.1

Q. Okay. You referred before to your experience. Based on your experience in this market and in this industry, when do you realistically expect that they will have their first sale of -- of risers – EXACTCAST riser sleeves in Japan?

A. My expectation would be that they'd have some

Q. Wher ?

A. Hopefully

4) Mr. Russell assumes that ASK does not have any other Japanese patents covering the subject riser sleeves – *Russell Tr.* p. 34, ll. 13-20

Q. Does ASK have any other Japanese patents that would protect the same riser sleeves in Japan as what the '168 patent protected?

A. I don't believe so. I'm not aware of any.

Q. Did you ever check on that?

A. I did not specifically.

However, Mr. Horvath testified that ASK has at least four other patents covering riser sleeves - *Horvath Tr., p. 169, l. 18 - p. 170, l. 5*

Q. And even though patent -- patent at list -- or, at Item No. 4, which is the Japanese '168 patent, there are still at least four other patents that are -- that are in Japan that relate to the EXACTCAST riser sleeve; is -- is that correct?

A. They relate to the EXACTCAST riser sleeve, but it's not the original that -- the -- the broadest-based patent that we have. These are all just extensions and different ways to produce the products. So these are just, like, product line extension patents, basically, from what I can tell.

30

5) Mr. Russell assumes there are no patents owned by other parties that would prevent ASK from selling EXACTCAST riser sleeves in Japan.

> Q. If ASK is precluded from entering the Japanese market due to other Japanese patents, is the ▆▆▆▆ in revenue per year reasonable?
> A. Not if they're precluded from entering that market.
> Q. Would it be important for you – for you to know if this were the case?
> A. I believe if that were the case, it would have been -- it certainly would be important, and I would expect that Mr. Horvath would have made me aware of such a critical detail.
> Q. Is Mr. Horvath an expert on Japanese patents?
> A. I don't know all of Mr. Horvath's expertise.
> Q. Did you make any independent study as to whether there were Japanese patents that could preclude the entry of the EXACTCAST riser sleeves into Japan?
> A. I did not.

Bates numbered document ASK 872 of D7 presented in Mr. Horvath's deposition indicated that, at least as of ▆

EXACTCAST.  However, Mr. Horvath does not know if there are currently other patents.

*Horvath Tr., p. 121, l. 11 – p. 123, l. 3*

> Q.  Okay.  Let's go to Page 872, A- --- ASK 872 of D 7.
>     Please read the second paragraph of the first column.
> A.
>
>
>
> Q.  Now, does▆ --
> A.  Uh-huh.
> Q.  -- have -- have a product that is ▆▆▆▆ ?
> A.   Not that I'm aware of.  This was -- this was -- This document was created before the patent issued, so I'm assuming that, once the patent issued, they were not able to copy our product.
> Q.  Okay.  But -- But you don't know that?  I mean, that's just a guess?
> A.  Yeah.  That's a guess.  It was ▆ I -- I didn't have anything to do with this -- this document, so...
> Q.   No, what I'm saying is but -- right now you say -- I asked whether

31

> A.   Right.  And I said in my previous -- on the previous question that, as far as we know, nobody has introduced a ▬▬▬▬▬▬ in the Japanese market.
>
> Q.   Okay.  Now, is -- does ▬▬▬ have patents similar to the EXACTCAST patent?
>
> A.   I -- I don't know.  I don't know. They -- They probably have some sort of patents, but, obviously, it wasn't similar to the EXACTCAST patent or they wouldn't have been issued, so...

6) Mr. Russell's assumption is that there are no competitive products in the Japanese marketplace that provide the same benefits as the riser sleeves at issue.

Mr. Russell relies upon Mr. Horvath to supposedly establish that there was not a product within the Japanese marketplace that would compete with the particular quality and specific attributes of the ASK riser sleeve at issue:  (*Russell Tr.* at 32-33)

> Q.   Would it be important to know whether another -- whether or not – someone else's riser sleeve that provided the same benefits to an end user that are provided in the '168 patent in this -- in this consideration?
>
> A.   During my discussions with Mr. Horvath -- Horvath, his description to me was that there was not a competing product that was -- that would compete with this particular quality and the specific attributes of this patented product.
>
> Q.   Did you do anything else to find out if there wasn't a competing product?
>
> A.   I did not.

Mr. Russell has no personal knowledge of competing products in Japan. *Russell Tr.* at page 33:

> Q.   So you don't really know if there was a competing product available in Japan during that time?
>
> A.   No, I do not have direct knowledge of that.

Clearly, any lost profits analysis requires knowledge of the marketplace and how the Plaintiff's product would compete with other products in the subject marketplace. Mr. Russell merely relies upon the statements of Plaintiff's employee, Mr. Horvath, and performs no independent verification, investigation, or assessment of this information.  However, Mr. Horvath stated:

32

a.  He is aware of competing products. *Horvath Tr.*, p. 69, ll. 3-7

> Q.  But aren't there -- aren't there products in Japan that -- that compete with -- with the exo- -- with the EXACTCAST sleeve in Japan now?
>
> A.  Of course.

b.  He is not an expert as far as the riser sleeve market in Japan.  *Horvath Tr.*, p. 152, ll. 11-24

> Q.  What is your knowledge of the – of the companies that sell riser sleeves in Japan?
>
> A.  As I said before, I -- I'm aware of the three major players in the market.
>
> Q.  Is -- Is this kind of knowledge something that -- that -- that you would be -- that you feel yourself to be an expert in as far as the riser sleeve market in Japan?
>
> A.  No.  But the information that I have gotten, I have gotten from our Japanese sales organization, who I would consider experts in the Japanese market.

7)  Mr. Russell's economic damage model assumes that a manufacturing facility would be built in ⬚ exclusively for the purpose of making riser sleeves for the Japanese market.  (*Russell Tr.* at p. 140, l. 13 – p. 141, l. 1)

> Q. Specifically, what was the capacity?
> A. I don't know the specific capacity.
> Q. Would the production at this facility only be for the Japanese market?
> A. I believe that was the intention.
> Q. So they wouldn't provide riser sleeves for any other market?
> A. I don't believe any other market was considered for the cost related to this plant.
> Q. How long would it take to build this facility?
> A. I don't recall a specific construction timeline.

However, the global joint venture ASK Chemicals GmbH that would actually construct a plant in ⬚ if one were to be constructed, was stopped due to zoning restrictions, *Horvath Tr.*, p. 214, l. 12 – p. 215, l. 3:

33

Q. And so you -- I believe you have testified, haven't you, that ▆▆▆▆▆permits are -- have to be obtained before you -- before you put any EXACTCAST class --EXACTCAST riser plants in ▆▆▆▆?

A. Well, it's -- it's not a matter of an -- getting an actual permit. It's we're -- based on the zoning on our site, we're not permitted to -- to do that process on our site.

Q. Okay. So -- Okay.

A. So as of, basically, the summer of 2012, all -- everything that we had decided to do was basically to put the plant -- or, put the production capabilities in our plant, and then that was stopped based on the -- the zoning.

8) Mr. Russell assumes there are no Japanese government regulations that would prevent the importation of ASK riser sleeves. Mr. Russell agrees this is important information.

*Russell Tr.* p. 177, ll. 2-18

Q. If ASK is pre- -- is precluded from entering the Japanese market due to Japanese governmental relation -- regu- -- regulations, is the ▆▆▆▆▆ ▆▆▆▆in revenue per year reasonable?

A. Not if they're precluded from entering in that market.

Q. Would it be important for you to know if this were the case?

A. If that were the case, I believe I would have been made aware of that by Mr. Horvath or by his -- by ASK Chemicals' counsel.

Q. Is Mr. Horvath an expert on Japanese governmental relations -- regulations?

A. I previously said I'm not aware of Mr. Horvath's specific expertise.

Mr. Horvath admits he has no idea what regulatory bodies would need to approve the importation of EXACTCAST riser sleeves into the Japanese market, *Horvath Tr.*, p. 215, ll. 4-7:

Q. What Japanese regulatory bodies need to approve the importation of EXACTCAST riser sleeves into the Japanese market?

A. I have no idea.

9) Mr. Russell assumes the '168 patent at issue covers the entire EXACTCAST product line.

Q. In your damage model, have you assumed that the '168 patent would cover the entire EXACTCAST product -- product line?

A. I have. I have.

Mr. Horvath testified that the brand name EXACTCAST applies to many different riser sleeves. *Horvath Tr.*, p. 409, ll. 4-20:

> Q.   So there are -- there -- there are EXACTCAST products that are produced that do  not use the cold-box process; is -- did you just testify to that?
> A.   Yeah.  It's -- because it's a trade name.
> Q.  I --
> A.   It's not specific to the -- to the technology.  We -- we -- Basically, up until the point of the joint venture, EXACTCAST technology basically described anything we made within the patent.  But after the joint venture, we consoli- -- we consolidated a lot of different tradenames that we had from the different pieces of the joint venture and put them all under the EXACTCAST name as a – as a brand name, basically.

Mr. Russell's methodology contains numerous fundamental assumptions that are completely inconsistent with case facts and therefore, Mr. Russell should be precluded from testifying on the subject of any alleged economic damages.

## C.    Mr. Russell's Damage Calculation Fails To Account For Plaintiff's Ability to Mitigate

When an entity suffers economic damages as a result of a breach of contract, the entity has the legal obligation to minimize the effects and losses resulting from the wrongful conduct..  The duty to mitigate works to deny recovery of any part of damages that could have been reasonably avoided.

In this case, Mr. Russell has assumed in his economic damage methodology that ASK will not enter the Japanese market ASK will enter the Japanese market with the riser sleeve product at issue. – *Russell Tr.* p. 33, ll. 19-25 and p. 34, ll. 1-12

> Q. Is it your opinion that not having the patent at issue in this case will preclude ASK from entering the Japanese riser market?
> A. Based on my understanding and discussions with Mr. Horvath, I -- I don't believe that ASK now sees that it would necessarily be worth the financial risk to go ahead and attempt to enter that market without having the patent.
> Q. So it is your understanding that ASK is not going to attempt to enter that – the riser market in Japan at this time?

35

> A. I don't know. I don't believe there were plans of that. They had continued to provide samples and I had documents on those -- actually, I -- I am speculating to answer that question. I -- I don't know if they intend to or not without the patent.

However, Mr. Horvath testified that ASK may have sales as early.

*Horvath Tr.* p. 425, ll. 17-25 and p. 426, l.1

> Q. Okay. You referred before to your experience. Based on your experience in this market and in this industry, when do you realistically expect that they will have their first sale of -- of risers – EXACTCAST riser sleeves in Japan?
> A. My expectation would be that they'd have some
> Q. When            ?
> A. Hopefully by

Mr. Russell agrees that if ASK enters the Japanese market, he has not considered this mitigating action and therefore the economic damages expressed in his report are overstated . – *Russell Tr.* p. 197, ll. 18-25 and p. 198, ll. 1-6

> Q. If ASK actually enters the Japanese riser sleeve market some day, wouldn't the resulting profits need to be subtracted from your opinion on damages?
> A. Yes. If they actually entered the market, if -- if they had profits from that market, those would be considered mitigating, you know, benefits to these damages.
> Q. And that was not included in your report?
> A. It was not. It assumes that they wouldn't enter the market now that they had lost the patent due to the lack of payment of the annuity.

Clearly, Mr. Russell's failure to account for the Plaintiff ASK's mitigation grossly overstates any alleged economic damages,, and Mr. Russell should therefore be precluded from providing any testimony at trial on the subject of economic damages.

## D.    Mr. Russell's Methodology Is Speculative

In his report, Mr. Russell makes a number of unsupported, conclusory opinions and statements concerning the market potential for ASK riser sleeves. Mr. Russell himself agrees that this subject is speculative:

1) Mr. Russell agrees there was "some degree of subjectivity and speculation" in his quantification of the economic damages, *Russell Tr.*, p. 15, ll. 7-19:

> Q. Am I also correct that it is your opinion ASK's economic damages should be expressed as the sum of two components: Lost profits and lost royalties?
> A. That's correct.
> Q. Now, am I correct that, in order for you to quantify these economic damage components, it is req- -- it required some degree of speculation on your part because there is no historical performance of ASK in Japan in order to base your analysis?
> A. That's correct. There is some degree of subjectivity and speculation.

2) Mr. Russell based the 10-year damage period for this patent valuation on his experience in doing business valuation and financial projections, *Russell Tr.*, p. 145, l. 4 – p. 147, l. 18:

> Q. Who determined that the damage period is 10 years?
> A. That was my determination based on what I believed could be a reasonable projection period. Obviously, we had a -- a five-year period from the current dates up to the anticipated March 21st of 2017 expiration date of the patent. And I felt a matching five-year estimate into the future would be a reasonable and conservative estimate; and that going beyond that additional five years may be too speculative.
> Q. Why did you determine that this was a reasonable estimate?
> A. Just based on my experience in doing business valuation work and financial projections, it's very common to look at five years of historical information and also consider five additional future years. It's kind of a -- a standard in the business valuation industry.
> Many times, that five-year projection period in the future would also include a terminal value or something that assumes another 10 to 20 years in the future, but I didn't do that in this case and limited the calculations to a total 10-year period.
> Q. But this is a patent and not a business valuation.
> A. That's correct. But all the -- the value of a patent and the value of any economic benefit streaming from a particular intangible asset is all within the context of a business environment, and you would use the same general principles and methodologies and financial analyses that you do in a business valuation.
> Q. Is there support for -- for this conclusion?

37

A. It's my professional judgment, and I think you could find support for going out 15 and 20 years in the future just as well as 5 to 10 years. It's based on the professional experience of the valuator.

Q. I'm talking about comparing a patent with -- with -- with a business. Is this -- Is this something that you consider to be common in -- in your profession?

A. Certainly. Any -- any valuation -- let me -- Let me say it this way. It's – A business valuation is based on the anticipated future economic benefits that the owner of that business is going to enjoy, which is no different than the value of any piece of intellectual property, whether it's a patented piece of property, copyrighted, or anything else.

The value, the economic value, of that particular intangible asset is based upon the anticipated future economic benefits that you would derive from holding that property.

So it -- it's all based on the same underlying financial theory that business valuation is or any kind of asset valuation.

3) Mr. Russell used in his calculations a half-percent market decrease when the patent expires.  In his deposition, Mr. Russell explains this is a "reasonable estimate" based on his discussions with Mr. Horvath.  It was not based on any empirical data and it is "certainly possible" for the decrease to be       , *Russell Tr*., p. 79, l. 1 – p. 80, l. 14:

Q. So when you say that when the -- when the patent expired, that it was -- that the market was going to decrease by a                , where did that information come from? I mean, why -- why do you think it's going to decrease by                '

A. Just based on my discussions with Mr. Horvath, just it's a -- a reasonable estimate.

Q. Base -- Based on what?

A. I don't have any specific empirical data for it. I mean, it -- again, these -- you know, all financial forecasts have a certain amount of underlying assumptions and estimates that are just inherent in making those assumptions. And I think these assumptions and the inherent estimates and the underlying percentages and risks that are included within them are reasonable based on the information that I have.

38

Q. But couldn't it -- couldn't it be that their -- that the mar- -- the market would have gone -- would -- would have increased? Because you -- you testified that they were, you know, being accepted in the market.

A. It certainly is possible. I mean, in -- in reality, they may have achieved the ⬛⬛⬛⬛⬛ market share that was originally anticipated by Ashland Chemical back in ⬛⬛⬛ And -- But based on my discussions with Mr. Horvath, we felt it was a more conservative and realistic estimate to believe that they would only get to a⬛⬛ percent market share.

Q. And instead of the half-percent decrease, it could have been ⬛⬛⬛⬛⬛ decrease, isn't that possible?

A. It's certainly possible.

4) Mr. Russell can't cite a specific empirical factor or something that's evidenced in the market that supports extending the calculation period five years beyond the patent's expiration date. Russell used his professional judgment. *Russell Tr.*, p. 152, ll. 9-19:

Q. Well, what specific factors did you consider in determining the calculation period extended five years beyond -- past the patent's expiration?

A. I can't cite a specific empirical factor or something that's evidenced in the market. It was my professional judgment.

Q. So it could be one year, couldn't it?

A. Anything's possible. It could be 15 or 20 years.

5) In Mr. Russell's professional judgment, projecting beyond a 10-year period would be too speculative. *Russell Tr.*, p. 152, l. 20 – p. 153, l. 12:

Q. In the last sentence of this section, and I think we're -- we're referring to Section III at A.5., you use the word "speculative." Do you see that?

A. Yes.

Q. Can you define that word as you have used it?

A. I use it in this context in saying that, "However, it may be too speculative to estimate the economics after 10 years so I have limited my analysis in order to take a conservative approach."

So that, in my opinion, that it would go beyond a reasonable accounting certainty, so to speak, or reasonable professional judgment to go beyond a 10-year period in the future, I felt that could be considered too speculative.

39

In addition, Mr. Russell utilizes a source document that is specifically labeled as a "guess" (refer to *Deposition Exhibit 49*) in order to substantiate his use of the [                    ] that was not prepared by either party in this litigation.  Other than Mr. Russell's review of this [                    ] with Mr. Horvath, someone who was not involved with the EXACTCAST product until 2009 (*Horvath Tr*. p. 19), Mr. Russell did not do any other independent verification. (*Russell Tr*. p. 107)

Accordingly, the court should exclude Mr. Russell's report due to its highly speculative nature.

## VI.  MR. RUSSELL'S METHODOLOGY CALCULATES ECONOMIC DAMAGES BEYOND THE SUBJECT PATENT'S EXPIRATION

The economic damage analysis prepared by Mr. Russell covers the time period of 2013 through 2022.  *Refer to Russell Rpt., Schedule 1*.  The subject patent of this litigation, Japanese Patent 3,278,168, would have expired on March 21, 2017 had it not lapsed on February 15, 2010.  Therefore, Mr. Russell's methodology is computing damages after the '168 patent's expiration date of March 21, 2017.

The right conferred by the patent grant is "the right to exclude others from making, using, offering for sale, or selling" the invention in the issuing country or "importing" the invention into the issuing country.  The right commences on the date of patent issuance and expires on the date of patent expiration.  Once expired, anyone can make, use, offer to sell, and sell the previously patented invention.

Only in cases involving patent infringement and situations where the infringer, because it infringed during the term of the patent and built market share, can a Plaintiff appropriately make a claim for economic damages post-patent expiration ("accelerated reentry damages").  In such

patent infringement cases, the infringer may be a participant in the market at a higher level when the patent expires than would otherwise have been the case but for the infringement and can therefore take a higher level of profit from the patent owner in the post-expiration period as a direct result of the infringement before the patent expired.  *See TP Orthodontics, Inc. v. Prof'l Positioner's, Inc.*, 1990 U.S. Dist. LEXIS 15219, *30, 17 U.S.P.Q.2d 1497, 1504–05 (E.D. Wis. 1990), vacated in part, 1991 U.S. Dist. LEXIS 9660, 20 U.S.P.Q.2d 1017 (E.D. Wis. 1991), on reconsideration, 1992 U.S. Dist. LEXIS 9139, 22 U.S.P.Q.2d 1628 (E.D. Wis. 1992), *aff'd*, 980 F.2d 743, 1992 U.S. App. LEXIS (Fed. Cir. 1992).

In this case, any consideration of damages after the '168 patent's expiration date of March 21, 2017 would require the assessment of the marketplace where all competitors could utilize the '168 patent technology.  Mr. Russell has not provided any analysis on this subject.

Therefore, Mr. Russell's methodology is therefore an impermissible extension of the patent "monopoly" beyond the patent's expiration date and Mr. Russell should therefore be precluded from expressing his opinion regarding lost profits at trial.

## VII.  MR. RUSSELL'S METHODOLOGY UTILIZES PATENT LICENSES THAT ARE NOT COMPARABLE TO THE HYPOTHETICAL LICENSE MR. RUSSELL IS ATTEMPTING TO CREATE

In the methodology utilized by Mr. Russell to quantify his alleged economic damages from lost royalties, Mr. Russell presents a hypothetical license that ASK Management informed him could have been entered into with a hypothetical Japanese licensee.  *Russell Rpt.*, page 11.

> Although the Patent was never licensed in Japan, the technology embodied in the patent has been licensed in          Specifically, the previous owner of the Patent, Ashland Inc. or its subsidiaries, licensed technology in the Patent to                                                    and '
> *Russell Rpt.*, page 10.

Specifically, Mr. Russell then bases the hypothetical license of the '168 patent on the

⟩license stating:

> *ASK Management anticipates that they could attract a Japanese licensee*
> *with terms similar to* ⬚ *Russell Rpt.,* page 11

Mr. Russell is fully aware that the ⬚ license is a non-exclusive license between Ashland

Specialty Chemical Company (a division of Ashland Inc.) and

⬚ for ⬚ and all patents based on ⬚

Application No. ⬚ to sell products in the ⬚ from the date of the

agreement ⬚ until the expiration of the licensed patents.  In addition, Mr. Russell

confirms there are several differences between the hypothetical license and the

1) Not in the same time period, *Russell Tr., p. 192, ll. 6-10*

> Q. Let's refer to Exhibit D 20.  Comparing your hypothetical license to the
> ⬚ are they in the same time
> period?
> A.      No, they are not.

2) Different licensor, *Russell Tr., p. 192, ll. 11-18*

> Q. Do they have the same licensor?
> A. No, because the licensor of the ⬚ -- and I'll say
> ⬚ -- was based on ASK Chemicals' predecessor, which was Ashland
> Specialty Chemical Company, and this was a date of ⬚. ASK Chemical did
> not come into existence until 2010.

3) Different patents are being licensed, *Russell Tr., p. 192, l. 19 - p. 193, l. 13*

> Q. Do they both have the same patents -- patent or patents involved?
> A. I believe this refers to the same patented technology that was transferred to
> ASK Chemical in 2010.
> Q. Let's turn to Exhibit 1.
>        (Discussion held between Mr. Hochberg and Mr. Robinson.)

Q. I'm talking about Exhibit 1 to this license. Do you see the patent or patents involved?

A. Yes, I do.

Q. And what patent or patents -- or, what patent or patents are involved in this -- in this license?

A. It's a ████████ Patent No.███████

Q. So these -- this is a different patent that -- than -- than you had testified to with respect to --

A. Yes, it is.

4) Providing patent rights in different countries, *Russell Tr., p. 193, ll. 14-16\*

Q. Do they both provide patent rights in the same country or countries?

A. No, they do not.

5) Different exclusivity restrictions, *Russell Tr., p. 193, l. 17 – p. 194, l. 18*

Q. Do both licenses have the same exclusivity restrictions?

A. I don't believe so.

Q. Do the licensees in both licenses have the right to sublicense?

A. You'll have to point me to it specifically.

Q. Okay.

A. I don't see the ability to sublicense in the GmbH agreement; however, it -- it may be in there.

Q. Please refer to Paragraph 2.2 of Exhibit D 20.

A. Yes, this particular license agreement provides the right to sublicense the licensee's affiliates to practice the license or its patents.

Q. And the hypothetical license did not have a -- a provision for sublicensing -- - licensing, did it?

A. I did not describe specific characteristics of it. I don't believe I made reference to the ability to sublicense or the inability to sublicense; just merely that it would have similar characteristics to the two different license arrangements that the predecessor had entered into.

The use of existing license agreements that are not comparable to the hypothetical license agreement that is being considered in a case have been the grounds for numerous patent infringement cases being remanded by The United States Court of Appeals Federal Circuit ("CAFC") where the plaintiff was seeking to base a reasonable royalty on incomparable license

agreements.  For example, in *Lucent Techs., Inc. v. Gateway*, 580 F.3d 1301, 1327–28 (Fed Cir. 2009), *Lucent* relied on eight varied license agreements which purportedly supported the jury's lump-sum damages award. However, when the CAFC examined the license agreements, along with the relevant testimony, they were left with two strong conclusions. First, some of the license agreements were radically different from the hypothetical agreement under consideration for the Day patent. Second, with the other agreements, the CAFC was simply unable to ascertain from the evidence presented the subject matter of the agreements, and therefore could not understand how the jury could have adequately evaluated the probative value of those agreements.

In *ResQNet.Com, Inc., et al. v. Lansa*, Inc., 594 F.3d 860 (Fed. Cir. 2010), after rejecting the set of licenses the plaintiff's expert opined were comparable to the hypothetical license because the CAFC felt they  "had no relation to the claimed invention," the CAFC  remanded the case back to the district court on the issues of damages, summarizing:

> During that remand, however, the trial court should not rely on unrelated licenses to increase the reasonable royalty rate above rates more clearly linked to the economic demand for the claimed technology.
>
> In sum, the district court erred by considering *ResQNet*'s re-bundling licenses to significantly adjust upward the reasonable royalty without any factual findings that accounted for the technological and economic differences between those licenses and the '075 patent.

594 F.3d at 872, 873.

Therefore, Mr. Russell's methodology of basing a hypothetical license agreement and its associated royalty rate on existing licenses that are incomparable to the hypothetical license at issue is a methodology that is routinely disallowed by the CAFC and therefore Mr. Russell should be precluded from expressing his opinion regarding lost royalties at trial.

## VIII.  MR. RUSSELL'S RELIANCE UPON HIS GENERAL EXPERIENCE IS NOT ENOUGH

Although Mr. Russell may not cure deficiencies in his report through subsequent testimony (*see, e.g., Pride,* 218 F.3d at 578; *Ciomber,* 527 F.3d at 642-43), his deposition testimony further demonstrates his abject failure to apply any reliable standard or methodology in reaching his opinions. When questioned about the methodology he implemented when analyzing the facts and forming his opinions set forth in his Report, Mr. Russell was unable to articulate any methods or principles but, rather, repeatedly relied on his own perceived "experience." *See, e.g., Russell Tr.* at 26-27, 29-30, 111-112, 212-214, 245. This is not good enough. *See, e.g., Nelson, et al.,* 243 F.3d at 254; *Tamraz, et al.,* 620 F.3d at 671; *General Electric Co.,* 522 U.S. at 146.

Even assuming, *arguendo,* that Mr. Russell's reliance on his experience was sufficient, Rule 702 clearly requires that an expert explain "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *See* Rule 702, advisory committee comments, 2000 Amends. Here, as in *Nelson, et al., Tamraz, et al.* and *General Electric Co.,* Mr. Russell attempts to fill in the gaping holes in the foundations for his opinions by falling back on his "experience." In his Report, however, Mr. Russell does not point to any specific experience, nor does he provide any explanation of how he applied his experience to his opinions or why such experience sufficiently supports his opinions. Mr. Russell's opinions are simply based on *ipse dixit,* rather than any reliable methods and principles and, therefore, should be excluded.

## IX.    CONCLUSION

In view of the foregoing, the Court should exclude Mr. Russell's Report and all of the opinions contained therein.

Dated: June __13__, 2013                             Respectfully submitted,

REDACTED
June __27__, 2013
_____                    _____
D. Peter Hochberg                                   D. Peter Hochberg, Esq.
Att.                                                D. Peter Hochberg Co., L.P.A.
                                                    1940 East 6th Street – 6th Floor
                                                    Cleveland, OH  44114
                                                    Tel: (216) 771-3800 / Fax: (216) 771-3804


### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following counsel by operation of the Court's electronic filing system.

Jeffrey S. Standley
F. Michael Speed, Jr.
Matthew W. Upton
Standley Law Group
6300 Riverside Drive
Dublin, OH   43017
Tel: (614) 792-5555 / Fax: (614) 792-5536
jstandley@standleyllp.com
mspeed@standleyllp.com
mupton@standleyllp.com


REDACTED
June __27__, 2013
_____                    _____
D. Peter Hochberg                                   D. Peter Hochberg, Esq.